## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

| | | |
|---|---|---|
| VICTOR FARISH, Derivatively on Behalf of Nominal Defendant ALFI, INC., | ) ) ) | |
| Plaintiff, | ) ) | Case No. _____ |
| v. | ) ) | JURY TRIAL DEMANDED |
| PAUL PEREIRA, DENNIS MCINTOSH, CHARLES PEREIRA, PETER BORDES, JOHN M. COOK, II, JUSTIN ELKOURI, ALLISON FICKEN, JIM LEE, RICHARD MOWSER, and FRANK SMITH, | ) ) ) ) ) ) ) ) | |
| Defendants, | ) ) | |
| and | ) ) | |
| ALFI, INC., | ) ) ) | |
| Nominal Defendant. | ) | |

## <u>VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT</u>

Plaintiff Victor Farish ("Plaintiff"), by and through his undersigned attorneys, brings this derivative complaint for the benefit of nominal defendant Alfi, Inc. ("Alfi" or the "Company") against its Board of Directors (the "Board") and certain of its executive officers seeking to remedy the Individual Defendants'[1] breaches of fiduciary duties and violations of federal law. Plaintiff alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of

---

[1] The Individual Defendants are Paul Pereira ("P. Pereira"), Dennis McIntosh ("McIntosh"), Charles Pereira ("C. Pereira"), Peter Bordes ("Bordes"), John M. Cook, II ("Cook"), Justin Elkouri ("Elkouri"), Allison Ficken ("Ficken"), Jim Lee ("Lee"), Richard Mowser ("Mowser"), and Frank Smith ("Smith").

Defendants' publicly available documents, filing in various proceedings including a class action lawsuit alleging violations of federal securities laws captioned *Rodriguez v. Alfi, Inc.*, Case No. 1:21-cv-24232 (S.D. Fla.) (the "Securities Action"), conference call transcripts and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, Alfi's press releases, website, corporate governance documents, presentations, and conference calls, as well as analyst reports and other publicly available information concerning the Company.

## NATURE OF THE ACTION

1.     This shareholder derivative action is brought on behalf of Alfi against the Individual Defendant for breaching their fiduciary duties by: (i) making and/or authorizing false and misleading statements and material omissions regarding the Alfi's business, prospects, and internal controls; and (ii) failing to establish and/or oversee sufficient internal controls and/or reasonable information, oversight, and reporting systems concerning critical Company operations, including the adequacy of its public reporting.

2.     Alfi is an advertising-analytics solutions provider that focuses on the digital out of home ("DOOH") advertising market. The Company's technology is purportedly able to identify and utilize demographics (including age, gender, ethnicity, geolocation, and emotion) to deliver advertising content to ideal viewers with "real time, accurate and rich reporting on customer demographics, usage, interactivity and engagement[.]"

3.     The Company was founded by Defendants P. Pereira, C. Pereira, and Cook in 2018. On January 8, 2021, the Company filed its registration statement on Form S-1 with the SEC, which was subsequently amended seven times and declared effective on May 3, 2021 (the "Registration Statement"). On May 5, 2021, the Company filed a prospectus on Form 424B4, which formed a

part of the Registration Statement (the "Prospectus," and together with the Registration Statement, the "Offering Documents"). Alfi's initial public offering ("IPO") was completed on May 6, 2021.

4.       The Individual Defendants made and/or permitted others to make materially false and misleading statements in the Offering Documents and in subsequent statements concerning the Company's business, prospects, and regulatory standing. Specifically, the Individual Defendants failed to disclose that: (i) they caused or permitted the Company to engage in certain material corporate transactions without Board approval; (ii) certain of the Individual Defendants abused their control of the Company, including by making false and misleading statements concerning the Company's operations and prospects, using Company resources without authorization, and interfering with an independent internal investigation; and (iii) the Company had deficient internal controls and, as a result, faced a heightened risk of regulatory scrutiny, reputational harm, and other harms and costs.

5.       As detailed herein, the Board completely abdicated its duty to exercise oversight over the Company's affairs and, in the process, allowed Defendants P. Pereira, McIntosh, and C. Pereira to make false and misleading statements, and to engage in the improper transactions and other improper conduct descried below.

6.       The Individual Defendants breached their fiduciary duties by willfully or recklessly: (i) making and/or authorizing false and misleading statements and omissions of material fact; (ii) failing to correct and/or causing the Company to fail to correct these statements and omissions; and (iii) failing to establish, maintain, and/or monitor adequate reporting systems and internal controls.

7.       The Individual Defendants' false and misleading statements caused Company stock to trade at artificially inflated prices. During this period, the Individual Defendants caused Alfi to

repurchase (and overpay for) 137,650 of its own shares at these artificially inflated prices, which materially harmed the Company.

8.      The truth began to emerge after the market closed on October 28, 2021, when the Company disclosed that the Board had placed Chief Executive Officer ("CEO") P. Pereira, Chief Financial Officer ("CFO") McIntosh, and Chief Technology Officer ("CTO") C. Pereira on administrative leave and had terminated Defendant C. Pereira's employment effective immediately.

9.      The same day, the Company announced that the Board had authorized an internal investigation (the "Investigation"). On this news, the price per share of the Company's common stock declined $1.24, or approximately 22%, to close at $4.42 on October 29, 2021.

10.     On November 1, 2021, the Company announced that its independent registered public accounting firm, Friedman LLP ("Friedman"), had resigned. The Company also disclosed that Defendant Mowser, a then-member of the Board, had resigned.

11.     The November 1, 2021 announcement stated certain transactions undertaken by the Individual Defendants were improper and "undertaken by the Company's management without sufficient and appropriate consultation with or approval by the Board."

12.     The full truth emerged on November 15, 2021 after the Company disclosed it had received a document preservation request from the SEC related to an "ongoing [SEC] investigation." On this news, the price per share of the Company's stock declined $0.24 to close at $4.37 per share on November 16, 2021, a loss of 5%.

13.     On February 3, 2022, the Company announced that Defendants P. Pereira and McIntosh resigned from all positions at the Company on February 2, 2022.

14.     On February 23, 2022, the Company filed a current report on Form 8-K with the SEC, which included a summary of the Investigation and its principal findings. The February 23, 2022 Form 8-K detailed, among other things, improper transactions undertaken by the Individual Defendants – including that "former senior management" caused Alfi to: (i) purchase a condominium in Miami Beach, Florida for approximately $1.1 million; and (ii) enter into an agreement to sponsor a sports tournament for two years for $640,000 without the Board's knowledge or approval – and noted that the Company had deficient internal control over financial reporting.

15.     Specifically, on February 23, 2022, the Company admitted that its internal control over financial reporting was deficient with respect to the disbursement process for third-party vendors, the review and approval process for significant vendor contracts, the use of Company credit cards by executives, the supervision of travel and entertainment expenses incurred by executives, the segregation of duties in connection with the payment and recording of invoices. The findings of the Investigation set forth certain recommendations to enhance the Company's internal control over financial reporting, including enhanced controls for disbursements of funds for vendor invoices, segregating duties across financial operations, developing a comprehensive accounting manual, maintaining a newly established travel and entertainment policy, establishing a review and approval process for significant vendor contracts; and retaining a consulting firm specializing in internal control implementation and design.

16.     On March 11, 2022, the Company filed another current report on Form 8-K with the SEC which announced that it faced a liquidity problem and that previously issued interim financial statements should no longer be relied upon because of accounting errors.

17.     The Individual Defendants breached their fiduciary duties by willfully or recklessly making and/or allowing others to make false and misleading statements that failed to disclose, *inter alia*, that: (i) the Company had engaged in the improper transactions (detailed further, *infra*); (ii) certain of the Individual Defendants made false and misleading statements concerning the Company's operations and prospects, used Company resources without authorization, and interfered with the Investigation (detailed further, *infra*); (iii) the Company failed to maintain adequate disclosure controls and procedures and internal control over financial reporting; and (iv) as a result, the Company faced an increased risk of regulatory scrutiny.

18.     The Individual Defendants further breached their fiduciary duties by failing to correct and/or causing the Company to fail to correct these false and misleading statements and omissions of material fact, and by willfully or recklessly causing the Company to fail to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls over financial reporting.

19.     The Individual Defendants' misconduct has caused and will continue to cause significant harm to the Company. Indeed, the misconduct caused purchasers of Company stock to sue the Company, its former CEO, interim CEO, former CFO, Chief Business Development Officer ("CBDO"), and five current or former Company directors in the Securities Action, and has further subjected the Company to the need to undertake the Investigation, the need to implement adequate internal controls, and losses from the waste of corporate assets, among other things.

20.     Plaintiff did not make a demand on the Board because, as further detailed herein, such a demand would be a futile and useless act, including because the Individual Defendants face a substantial likelihood of liability for the conduct alleged herein and in the Securities Action.

## JURISDICTION AND VENUE

21.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and section 27 of the Securities Exchange Act of 1934 (the "Exchange Act") over the claims asserted herein for violations of Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78(t), Rule 10b-5 (17 C.F.R.§ 240.10b-5) promulgated under Section 10(b) by the SEC, Section 21D(f)(5) of the Exchange Act (15 U.S.C. § 78u-4(f)(5)), and Section 11(a) and (f)(1) of the Securities Act of 1933 (the "Securities Act") (15 U.S.C. §§ 77k(a), 77(f)(1)).

22.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

23.     This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

24.     In connection with the acts, conduct and other wrongs complained of herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail, and the facilities of a national securities market.

25.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because Nominal Defendant Alfi is headquartered in this District and conducts business in this District.

## PARTIES

*Plaintiff*

26.     Plaintiff is, and has been at all relevant times, a shareholder of Alfi.

*Nominal Defendant*

27.     Alfi is a Delaware corporation with its principal executive offices at 429 Lenox Avenue, Suite 547, Miami Beach, Florida 33139. Alfi's shares trade on the NASDAQ under the ticker symbol "ALF."

***Individual Defendants***

28.     Defendant P. Pereira is a co-founder of the Company and served as Chairman of the Board, CEO, and President from April 2018 until February 2, 2022.

29.     Defendant McIntosh served as the Company's CFO and a member of the Board from October 2020 until February 2, 2022.

30.     Defendant C. Pereira is a co-founder and the son of Defendant P. Pereira. Defendant C. Pereira served as the Company's CTO from April 2018 until October 28, 2021.

31.     Defendant Bordes is a member of the Board of the Company and was appointed to be Interim CEO on October 22, 2021.

32.     Defendant Cook has served as the Company's CBDO since October 2020 and served as a director until May 6, 2021.

33.     Defendant Elkouri served as a Company director until May 6, 2021.

34.     Defendant Ficken has served as a member of the Board since May 6, 2021.

35.     Defendant Lee is a member of the Board and, on October 22, 2021, assumed the role of Chairman.

36.     Defendant Mowser served as a member of the Board until his resignation on October 27, 2021.

37.     Defendant Smith has served as a member of the Board since May 6, 2021.

***Non-Parties***

38.     Non-parties Patrick Dolan ("Dolan") and Jeremy D. Daniel ("Daniel") are current members of the Board.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

39.     By reason of their positions as officers and/or directors of Alfi, and because of their ability to control the business and corporate affairs of Alfi, the Individual Defendants owed Alfi

and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Alfi in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of Alfi and its shareholders so as to benefit all shareholders equally.

40.     Each director and officer of the Company owes to Alfi and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligation of fair dealing.

41.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Alfi, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

42.     To discharge their duties, the officers and directors of Alfi were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

43.     Each Individual Defendant, by virtue of his or her position as a director and/or officer owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of Alfi, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

44.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the

NASDAQ stock exchange, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, financial statements, products, management, internal controls, earnings, and present and future business prospects, including the dissemination of false and/or materially misleading information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful, accurate, and fairly presented information.

45.     To discharge their duties, the officers and directors of Alfi were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company.   By virtue of such duties, the officers and directors of Alfi were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware and the United States, and pursuant to Alfi's own Code of Business Conduct & Ethics (the "Code of Conduct");

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how Alfi conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of Alfi and procedures for the reporting of the business and internal

affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Alfi's operations would comply with all applicable laws and Alfi's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, inter alia, each of the subjects and duties set forth above.

46.     Each of the Individual Defendants further owed to Alfi and the shareholders the duty of loyalty requiring that each favor Alfi's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

47.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Alfi and were at all times acting within the course and scope of such agency.

48.     Because of their advisory, executive, managerial, and directorial positions with Alfi, each of the Individual Defendants had access to adverse, non-public information about the Company.

49.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Alfi.

**CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

50.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing.  The Individual Defendants caused the Company to conceal the true facts as alleged herein.  The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

51.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty and unjust enrichment.

52.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully, recklessly, or negligently to conceal material facts, fail to correct such misrepresentations, and violate applicable laws.

53.     In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.  Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants, who are directors or officers of Alfi, was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

54.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with actual

or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

55.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Alfi and at all times acted within the course and scope of such agency.

## ALFI'S CODE OF BUSINESS CONDUCT AND ETHICS

56.     Alfi maintains a Code of Business Conduct and Ethics (the "Code of Conduct") that is applicable to all Company, employees, officers and directors.

57.     The Code of Conduct states:

This Code reflects the Company's commitment to this culture of honesty, integrity and accountability and outlines the basic principles and policies with which all employees, officers and directors are expected to comply. Therefore, we expect you to read this Code thoroughly and carefully.

In addition to following this Code in all aspects of your business activities, you are expected to seek guidance in any situation where there is a question regarding compliance issues, whether with the letter or the spirit of the Company's policies and applicable laws. Cooperation with this Code is essential to the continued success of the Company's business and the cultivation and maintenance of its reputation as a good corporate citizen. Misconduct is never justified, even where sanctioned or ordered by an officer or other individual in a position of higher management. No individual, regardless of stature or position, can authorize actions that are illegal, or that jeopardize or violate Company standards. We note that this Code sets forth general principles of conduct and ethics and is intended to work in conjunction with the specific policies and procedures that are covered in the Company's compliance manual or in separate specific policy statements, such as the Securities Trading Policy and the Related Persons Transaction Policy, and you should refer to those policies and procedures for more detail in the specified context.

58.     Under the section titled, "Public Reporting", the Code of Conduct states:

Full, fair, accurate and timely disclosure must be made in the reports and other documents that the Company files with, or submits to, the SEC and in its other public communications. Such disclosure is critical to ensure that the Company maintains its good reputation, complies with its obligations under the securities laws and meets the expectations of its stockholders. Persons responsible for the

preparation of such documents and reports and other public communications must exercise the highest standard of care in accordance with the following guidelines:

- all accounting records, and the reports produced from such records, must comply with all applicable laws;
- all accounting records must fairly and accurately reflect the transactions or occurrences to which they relate;
- all accounting records must fairly and accurately reflect in reasonable detail the Company's assets, liabilities, revenues and expenses;
- accounting records must not contain any false or intentionally misleading entries;
- no transactions should be intentionally misclassified as to accounts, departments or accounting periods;
- all transactions must be supported by accurate documentation in reasonable detail and recorded in the proper account and in the proper accounting period;
- no information should be concealed from the internal auditors or the independent auditors; and
- compliance with the Company's internal control over financial reporting and disclosure controls and procedures is required.

59. Under the section titled "Compliance with Laws, Rules and Regulations", the Code of Conduct states:

Compliance with both the letter and spirit of all laws, rules and regulations applicable to the Company, including any securities exchange or other organization or body that regulates the Company, is critical to our reputation and continued success. All employees, officers and directors must respect and obey the laws of the cities, states and countries in which the Company operates and avoid even the appearance of impropriety.

Employees, officers or directors who fail to comply with this Code and applicable laws will be subject to disciplinary measures, up to and including discharge from the Company.

## ALFI'S AUDIT COMMITTEE CHARTER

60. The Charter of the Audit Committee of Alfi (the "Audit Committee Charter") states, "[e]ach member of the Committee must be able to read and understand fundamental financial statements, including the Company's balance sheet, income statement and cash flow statement."

61. The Audit Committee Charter states the purpose of the committee is "to oversee the Company's accounting and financial reporting processes and the audit of the Company's financial statements." Further:

14

The primary role of the Committee is to oversee the financial reporting and disclosure process. To fulfill this obligation, the Committee relies on: management for the preparation and accuracy of the Company's financial statements; both management and the Company's internal audit department/management for establishing effective internal controls and procedures to ensure the Company's compliance with accounting standards, financial reporting procedures and applicable laws and regulations; and the Company's independent auditors for an unbiased, diligent audit or review, as applicable, of the Company's financial statements and the effectiveness of the Company's internal controls. The members of the Committee are not employees of the Company and are not responsible for conducting the audit or performing other accounting procedures.

62.     Among the responsibilities of the Audit Committee, as delineated in the Audit Committee Charter, is to, at least annually:

obtain and review a report by the Company's independent auditors that describes (1) the accounting firm's internal quality control procedures, (2) any issues raised by the most recent internal quality control review, peer review or Public Company Accounting Oversight Board review or inspection of the firm or by any other inquiry or investigation by governmental or professional authorities in the past five years regarding one or more audits carried out by the firm and any steps taken to deal with any such issues, and (3) all relationships between the firm and the Company or any of its subsidiaries; and to discuss with the independent auditors this report and any relationships or services that may impact the objectivity and independence of the auditors.

***

review and discuss with the Company's independent auditors (1) all critical accounting policies and practices to be used in the audit; (2) all alternative treatments of financial information within generally accepted accounting principles ("GAAP") that have been discussed with management, the ramifications of the use of such alternative treatments and the treatment preferred by the auditors; and (3) other material written communications between the auditors and management.

***

review and discuss with the Company's independent auditors and management (1) any audit problems or difficulties, including difficulties encountered by the Company's independent auditors during their audit work (such as restrictions on the scope of their activities or their access to information), (2) any significant disagreements with management and (3) management's response to these problems, difficulties or disagreements; and to resolve any disagreements between the Company's auditors and management.

***

review with management and the Company's independent auditors: any major issues regarding accounting principles and financial statement presentation,

including any significant changes in the Company's selection or application of accounting principles; any significant financial reporting issues and judgments made in connection with the preparation of the Company's financial statements, including the effects of alternative GAAP methods; and the effect of regulatory and accounting initiatives and off-balance sheet structures on the Company's financial statements.

\*\*\*

review with management and the Company's independent auditors the adequacy and effectiveness of the Company's financial reporting processes, internal control over financial reporting and disclosure controls and procedures, including any significant deficiencies or material weaknesses in the design or operation of, and any material changes in, the Company's processes, controls and procedures and any special audit steps adopted in light of any material control deficiencies, and any fraud involving management or other employees with a significant role in such processes, controls and procedures, and review and discuss with management and the Company's independent auditors disclosure relating to the Company's financial reporting processes, internal control over financial reporting and disclosure controls and procedures, the independent auditors' report on the effectiveness of the Company's internal control over financial reporting and the required management certifications to be included in or attached as exhibits to the Company's annual report on Form 10-K or quarterly report on Form 10-Q, as applicable.

\*\*\*

review and discuss with the Company's independent auditors and management the Company's quarterly financial statements and the disclosure under "Management's Discussion and Analysis of Financial Condition and Results of Operations" to be included in the Company's quarterly report on Form 10-Q before the Form 10-Q is filed; and to review and discuss the Form 10-Q for filing with the SEC.

\*\*\*

review and discuss with management and the Company's independent auditors: the Company's earnings press releases, including the type of information to be included and its presentation and the use of any pro forma, adjusted or other non-GAAP financial information, before their release to the public; and any financial information and earnings guidance provided to analysts and ratings agencies, including the type of information to be disclosed and type of presentation to be made.

\*\*\*

review the Company's compliance with applicable laws and regulations and to review and oversee the Company's policies, procedures and programs designed to promote and monitor legal, ethical and regulatory compliance.

\*\*\*

review and approve the hiring or dismissal of the General Counsel. To review, with the General Counsel and outside legal counsel, legal and regulatory matters,

including legal cases against or regulatory investigations of the Company and its subsidiaries, that could have a significant impact on the Company's financial statements.

## SUBSTANTIVE ALLEGATIONS

*Background*

63.     Alfi is an advertising-analytics solutions company that operates in the DOOH marketplace. Using artificial intelligence and data analytics, among other things, the Company's technology makes sociological determinations as to individual consumers, and delivers targeted advertisements to match the identified demographic information.

64.     In connection with the Company's May 6, 2021 IPO, Alfi sold 4.3 shares of common stock and 4.3 warrants for aggregate gross proceeds of approximately $17.8 million before deducting underwriting commissions, discounts, and offering expenses.

65.     The Individual Defendants caused the Company to make false and misleading statements that failed to disclose a series of improper transactions and misconduct – and that, as a result, the Company faced an increased risk of regulatory enforcement and negative financial impacts. These misstatements and omissions of material fact had the effect of inflating the price of the Company's common stock, in which the Individual Defendants caused the Company to repurchase 137,650 shares of its own stock at artificially inflated prices.

66.     The Board abdicated its duty to exercise oversight over the Company's affairs and, in the process, allowed Defendants P. Pereira, McIntosh, and C. Pereira to make false and misleading statements concerning the Company's operations and prospects, engage in improper transactions, use Company resources without authorization, and interfere with the Investigation.

67.     On October 22, 2021, the Board authorized the Investigation into the improper transactions and other misconduct described herein.

68.     During the Investigation, Defendants P. Pereira, McIntosh, and C. Pereira engaged made false and misleading statements concerning the Company's operations and prospects, used Company resources without authorization, and obstructed the Investigation.

69.     For instance, in an interview with *Benzinga* occurring in or around June 2021, Defendant P. Pereira made statements announcing a $2 million share repurchase program without the Board's knowledge or approval. Further, according to the Investigation's findings, Defendant P. Pereira also gave an online interview to *Benzinga* on June 15, 2021, in which he touted that over 22,000 rideshare drivers had "signed up" with the Company, even though such number reflected only the drivers who had expressed interest in applying to secure contracts and, as of June 2021, only 1,253 drivers had contracts with the Company. Additionally, social media posts made from an account created on Defendant P. Pereira's computer made inaccurate statements regarding the Company in touting the Company and its prospects. The username associated with the account did not identify Defendant P. Pereira or the Company. Furthermore, Defendants P. Pereira, McIntosh, and C. Pereira each engaged in unauthorized use of the Company's computer systems or platforms after being placed on leave.

70.     According to the February 23, 2022 Form 8-K, Defendant C. Pereira took control of, and prevented the Company from administering, its Google Workspace and its Amazon Web Services. According to the Investigation's findings, Defendant C. Pereira's interference "hindered and delayed, and increased the expense to the Company of, the Investigation." Similarly, Defendants P. Pereira and McIntosh accessed and downloaded files from the Company's Google Drive, despite having been instructed not to access the Company's computer systems or platforms. Defendants P. Pereira, McIntosh, and C. Pereira breached their fiduciary duties to the Company by engaging in this misconduct.

*False and Misleading Statements*

71.     The Company filed the Registration Statement on January 8, 2021. The seventh and final amendment to the Registration Statement was filed on April 26, 2021, and the Registration Statement was declared effective on May 3, 2021.

72.     In the Registration Statement, the Company stated the following regarding its disclosure controls and procedures:

> Our disclosure controls and procedures are designed to reasonably assure that information required to be disclosed by us in reports we file or submit under the Exchange Act is accumulated and communicated to management, recorded, processed, summarized and reported within the time periods specified in the rules and forms of the SEC.

73.     With regard to the Company's internal controls over financial reporting, the Registration Statement stated the following:

> Our internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements in accordance with generally accepted accounting principles. In connection with this offering, we intend to begin the process of documenting, reviewing and improving our internal controls and procedures for compliance with Section 404 of the Sarbanes-Oxley Act, which will require annual management assessment of the effectiveness of our internal control over financial reporting.

74.     The statements above were materially false and misleading because the Individual Defendants failed to disclose, *inter alia*, that: (i) the Company had engaged in certain material corporate transactions without Board approval; (ii) Defendants P. Pereira, McIntosh, and C. Pereira abused their control of the Company, including by making false and misleading statements, using Company resources without authorization, and interfering with the Investigation; and (iii) the Company had deficient internal controls and as a result faced an increased risk of internal and regulatory investigations and costs.

75.     On May 5, 2021, the Company filed its Prospectus, which formed a part of the Registration Statement. In the Prospectus, the Company stated the following regarding its disclosure controls and procedures:

> Our disclosure controls and procedures are designed to reasonably assure that information required to be disclosed by us in reports we file or submit under the Exchange Act is accumulated and communicated to management, recorded, processed, summarized and reported within the time periods specified in the rules and forms of the SEC.

76.     With regard to the Company's internal controls over financial reporting, the Prospectus stated the following:

> Our internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements in accordance with generally accepted accounting principles. In connection with this offering, we intend to begin the process of documenting, reviewing and improving our internal controls and procedures for compliance with Section 404 of the Sarbanes-Oxley Act, which will require annual management assessment of the effectiveness of our internal control over financial reporting.

77.     On June 10, 2021, the Company filed its quarterly report with the SEC on Form 10-Q for the fiscal quarter ended March 31, 2021 (the "1Q21 10-Q"). the 1Q21 10-Q was signed by Defendants P. Pereira and McIntosh and contained certifications, signed by Defendants P. Pereira and McIntosh, pursuant to Rules 13a-14(a) and 15d-14(a) promulgated under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") attesting to the accuracy of the financial statements contained in the 1Q21 10-Q, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

78.     The 1Q21 10-Q stated the following regarding the effectiveness of the Company's disclosure controls and procedures:

> Our Chief Executive Officer and Chief Financial Officer evaluated the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act) as of March 31, 2021 (the

"Evaluation Date"). Based upon that evaluation, the Chief Executive Officer and the Chief Financial Officer concluded that, as of the Evaluation Date, *our disclosure controls and procedures are effective to ensure that information required to be disclosed by us in the reports that we file or submit under the Exchange Act (i) are recorded, processed, summarized and reported, within the time periods specified in the SEC's rules and forms and (ii) are accumulated and communicated to management, specifically our Chief Executive Officer and Chief Financial Officer, as appropriate to allow timely decisions regarding required disclosure.*

(Emphasis added).

79.    The 1Q21 10-Q stated that "[t]here was no change in our internal control over financial reporting . . . that occurred during the fiscal quarter ended March 31, 2021 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting."

80.    On August 16, 2021, the Company filed its quarterly report with the SEC on Form 10-Q for the fiscal quarter ended June 30, 2021 (the "2Q21 10-Q"). The 2Q21 10-Q was signed by Defendants P. Pereira and McIntosh and contained SOX certifications signed by Defendants P. Pereira and McIntosh attesting to the accuracy of the financial statements contained in the 2Q21 10-Q, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors. The 2Q21 10-Q stated the following regarding the effectiveness of the Company's disclosure controls and procedures:

Management, specifically our chief executive officer and chief financial officer, evaluated the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act) as of June 30, 2021 (the "Evaluation Date"). Based upon that evaluation, the chief executive officer and the chief financial officer concluded that, as of the Evaluation Date, *our disclosure controls and procedures are effective to ensure that information required to be disclosed by us in the reports that we file or submit under the Exchange Act (i) are recorded, processed, summarized and reported, within the time periods specified in the SEC's rules and forms and (ii) are accumulated and communicated to management, specifically our chief executive officer and chief financial officer, as appropriate to allow timely decisions regarding required disclosure.*

21

(Emphasis added).

81.     The 2Q21 10-Q stated that [t]here was no change in our internal control over financial reporting . . . that occurred during the fiscal quarter ended June 30, 2021 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting."

82.     Regarding an "Office Condo," the 2Q21 10-Q stated as follows: "The Company signed a contract to acquire additional office space for $1,100,000 in Miami Beach, FL on July 12, 2021. The purchase is expected to close late August." The foregoing statement was materially false and misleading because the Company's entry into the purchase contract for the Condominium was disclosed as a subsequent event, but at the time of filing on August 16, 2021 the Company had already completed the Condominium purchase on August 12, 2021.

83.     The statements above were materially false and misleading because the Individual Defendants failed to disclose, *inter alia*, that: (i) the Company had engaged in certain material corporate transactions without Board approval; (ii) Defendants P. Pereira, McIntosh, and C. Pereira abused their control of the Company, including by making false and misleading statements, using Company resources without authorization, and interfering with the Investigation; and (iii) the Company had deficient internal controls and as a result faced an increased risk of internal and regulatory investigations and costs.

84.     The Company admitted in its February 23, 2022 Form 8-K that its internal control over financial reporting was deficient with respect to the disbursement process for third-party vendors, the review and approval process for significant vendor contracts, the use of Company credit cards by executives, the supervision of travel and entertainment expenses incurred by executives, and the segregation of duties in connection with the payment and recording of invoices.

*The Truth Emerges*

85.     On October 28, 2021, after the market closed, Alfi filed a current report on Form

8-K with the SEC. The Form 8-K revealed that:

> On October 22, 2021, the Board of Directors (the "Board") of Alfi, Inc. (the
> "Company") placed each of Paul Pereira, the Company's President and Chief
> Executive Officer, Dennis McIntosh, the Company's Chief Financial Officer and
> Treasurer, and Charles Pereira, the Company's Chief Technology Officer, on paid
> administrative leave and authorized an independent internal investigation regarding
> certain corporate transactions and other matters.

*        *        *

> On October 28, 2021, Mr. C. Pereira's employment with the Company was
> terminated.

86.     On this news, Alfi's stock price declined $1.24 to close at $4.42 per share on

October 29, 2021, a loss of approximately 22%.

87.     On November 1, 2021, the Company filed a current report on Form 8-K with the

SEC, revealing the resignation of Friedman, the Company's independent registered public

accounting firm.

88.     The November 1, 2021 Form 8-K also disclosed that Defendant Mowser had

resigned from the Board because, *inter alia*, he believed the Board's decision to replace Defendants

P. Pereira, McIntosh, and C. Pereira "in my opinion was personal and calculated and driven by

certain directors/shareholders to take control of the company without any regard for due process."

89.     The November 1, 2021 Form 8-K also disclosed the following information

regarding the improper transactions described herein, which had caused the Company to undertake

the Investigation:

> The corporate transactions that precipitated the Board's actions to place the
> executives on paid administrative leave and to authorize the independent internal
> investigation included: (i) the Company's purchase of a condominium for a
> purchase price of approximately $1.1 million and the related erroneously certified

23

corporate resolution regarding the unanimous approval by the Board and the Company's stockholders of such purchase, and (ii) the Company's commitment to sponsor a sports tournament in the amount of $640,000, a portion of which was payable through the issuance by the Company of unregistered shares of the Company's common stock, and as to which the Company would be obligated to pay additional cash amounts if the net proceeds received by the recipient upon the sale of such shares are less than an amount specified in the contract and for which the Company would be given a credit toward sponsorship or attendance at events in the future if the net proceeds received by the recipient upon the sale of such shares exceed an amount specified in the contract. (The Company's entry into the contract for the purchase of the condominium was disclosed in the Company's Quarterly Report on Form 10-Q for the quarter ended June 30, 2021.) *These transactions were undertaken by the Company's management without sufficient and appropriate consultation with or approval by the Board.* The independent internal investigation is expected to investigate the details of the above-noted transactions and any other matters that come to the Board's attention regarding actions taken by the executives in their management of the Company. *One of the goals of the independent internal investigation is to help the Company in developing improved corporate governance policies and procedures to ensure that the Board is provided the opportunity to consider and provide appropriate input to the Company's management on significant corporate transactions.* If, during the course of the independent internal investigation, the Board uncovers any wrongdoing, it will take appropriate action with respect to the person or persons responsible therefor.

(Emphasis added).

90.     The statements above were materially false and misleading because the Individual Defendants failed to disclose, *inter alia*, that: (i) the Company had engaged in certain material corporate transactions without Board approval; (ii) Defendants P. Pereira, McIntosh, and C. Pereira abused their control of the Company, including by making false and misleading statements, using Company resources without authorization, and interfering with the Investigation; and (iii) the Company had deficient internal controls and as a result faced an increased risk of internal and regulatory investigations and costs.

91.     On November 15, 2021, after the market closed, the Company filed a current report on Form 8-K with the SEC, which stated:

On November 9, 2021, *the Company received a letter from the staff of the Securities and Exchange Commission (the "SEC") indicating that the Company, its affiliates and agents may possess documents and data relevant to an ongoing investigation being conducted by the staff of the SEC and notifying the Company that such documents and data should be reasonably preserved and retained until further notice. The materials to be preserved and retained include documents and data created on or after April 1, 2018 that*: (i) were created, modified or accessed by certain named former and current officers and directors of the Company or any other officer or director of the Company; or (ii) *relate or refer to the condominium or the sports tournament sponsorship identified in the Company's Current Report on Form 8-K filed on November 1, 2021*, or financial reporting and disclosure controls, policies or procedures. The Company intends to cooperate fully with the SEC in this matter.

(Emphasis added).

92.     Following the filing of the November 15, 2021 Form 8-K, Alfi filed a Form NT 10-Q (the "Form NT 10-Q") giving notice of the Company's inability to timely file its Form 10-Q for the period ended September 30, 2021 (the "3Q21 10-Q"), which stated:

Alfi, Inc. (the "Company") is unable, without unreasonable effort or expense, to file its Quarterly Report on Form 10-Q for the quarter ended September 30, 2021 (the "Quarterly Report") by the November 15, 2021 filing date applicable to smaller reporting companies: (i) due to recent changes in the Company's Chief Executive Officer and Chief Financial Officer and in the Chair of the Audit Committee (the "Audit Committee") of the Company's Board of Directors (the "Board"); and (ii) because the Company has not yet engaged a new independent registered public accounting firm, which is needed to provide the required review of the Company's financial statements to be filed as part of the Quarterly Report.

93.     Following these disclosures, the price per share of the Company's stock declined $0.24, to close at $4.37 on November 16, 2021, a loss of approximately 5.2%.

94.     As of the filing of this action, the Company's common stock continues to trade at prices well below the IPO price of $4.15.

95.     On February 23, 2022, the Company filed a current report on Form 8-K with the SEC announcing the findings of the Investigation. The Company stated that the Investigation was

conducted by a special committee of the Board (the "Special Committee") consisting of non-party

Allen Capsuto ("Capsuto").

96.    The Investigation found that the Company's "former senior management" caused

the Company to engage in improper rransactions. First, the February 23, 2022 Form 8-K described

the purchase of the condominium, Defendant P. Pereira's misconduct in signing a false

certification attesting to Board approval, and Defendant P. Pereira's and Defendant McIntosh's

misconduct in transferring the condominium to an LLC they controlled:

> The Company's former senior management caused the Company to purchase a
> condominium in Miami Beach, Florida (the "Condominium") for a purchase price
> of approximately $1.1 million without the Board's knowledge or approval. ***In
> connection with the purchase, Mr. P. Pereira signed a certification filed with
> Miami-Dade County which incorrectly stated that the Board and the Company's
> stockholders approved the purchase. Subsequently, the Condominium was
> transferred to a newly formed limited liability company (the "LLC") controlled
> by Messrs. P. Pereira and McIntosh, without the Board's knowledge or approval.***
> During the Investigation Messrs. P. Pereira and McIntosh stated that the LLC was
> owned by the Company and was formed to serve as a special purpose entity in order
> to facilitate a loan for which the Condominium would serve as security; however,
> the Investigation found no documentary evidence with respect to the ownership of
> the LLC. ***The Company's entry into the purchase contract for the Condominium
> was disclosed as a subsequent event in the Company's Quarterly Report on Form
> 10-Q for the quarter ended June 30, 2021 (the "Form 10-Q"), although at the
> time of filing the Form 10-Q the Company had already completed the purchase
> of the Condominium on August 12, 2021.*** The Condominium has been transferred
> back to the Company, and the Company has commenced the process of selling the
> Condominium.

(Emphasis added).

97.    The February 23, 2022 Form 8-K also described the Company's commitment to

sponsor the tournament, including Defendant McIntosh's role in signing a certification that falsely

indicated that the Board had authorized the issuance of stock in connection therewith:

> The Company's former senior management caused the Company to enter into an
> agreement to sponsor a sports tournament (the "Tournament") for two years, for a
> $640,000 sponsorship fee, which the Company paid $320,000 in cash and $320,000
> through the issuance of 31,638 shares of Common Stock. The sponsorship

agreement was executed, and the cash fee paid and the shares of Common Stock issued, without the Board's knowledge or approval. ***Mr. McIntosh signed a certification to the Company's transfer agent which incorrectly stated that such issuance was authorized by the Board.*** The Company has since obtained, in connection with the Company's termination of the sponsorship agreement, the return of the 31,683 shares of Common Stock. In addition, of the $320,000 in cash paid by the Company, $295,000 was converted to a charitable contribution and the remaining $25,000 was retained by the Tournament organizer.

(Emphasis added).

98.    The Investigation found further that Alfi's former senior management had caused

the Company to improperly enter into agreements with three vendors:

The Company's former senior management caused the Company to enter into agreements with three vendors: (i) an investor relations firm to provide investor relations and strategic consulting services and capital introductions ("Vendor 1"); (ii) a consultant to provide financial and business advice ("Vendor 2"); and (iii) a start-up call center to provide customer service, sales and onboarding services ("Vendor 3"). Under these agreements, the Company: (a) paid to Vendor 1 $808,000 (of which approximately $700,000 was in addition to amounts required under the agreement) and issued to Vendor 1 150,000 shares of Common Stock; and (b) issued to Vendor 2 150,000 shares of Common Stock, although the Investigation could not determine what, if any, services were provided by Vendor 2 to the Company. The shares of Common Stock were issued to Vendor 1 and Vendor 2 without the Board's knowledge or approval. ***Mr. McIntosh signed certifications to the Company's transfer agent which incorrectly stated that such issuances were authorized by the Board.*** Under the agreement with Vendor 3, the Company was to pay Vendor 3 for commission-based compensation (of which minimal commissions were earned or paid due to minimal sales) and to reimburse Vendor 3 for pre-approved costs or expenses. The Company paid to Vendor 3 $343,642, although the Investigation found no evidence that expenses were pre-approved by the Company.

(Emphasis added).

99.    The February 23, 2022 Form 8-K also found that Defendant P. Pereira had made

inaccurate and/or unauthorized statements concerning the Company, as follows:

***On June 22, 2021, Benzinga published an article based in part on an interview given by Mr. P. Pereira. The article stated, among other things, that the Company announced a $2 million buyback plan. The disclosure to Benzinga of a share repurchase program by the Company was made without the Board's knowledge or approval.*** The Board subsequently approved a share repurchase program by the

Company for up to $2.0 million of shares of Common Stock on June 23, 2021. *In addition, Mr. P. Pereira gave an online interview to Benzinga on June 15, 2021, during which he stated that the Company had over 22,000 rideshare drivers "signed up"; however, the Investigation found that, at such time, such number of drivers had expressed interest in applying to secure contracts with the Company and, in June 2021, 1,253 drivers had contracts with the Company. Such statement was made without the Board's knowledge or approval*. The Company filed with the SEC on June 23, 2021, Current Reports on Form 8-K disclosing certain statements made in the Benzinga article and disclosing the Board's authorization and approval of the share repurchase program. The share repurchase program was also disclosed in the Form 10-Q.

(Emphasis added).

100.    The Investigation also found:

Certain social media posts (since removed from the platform) were made from an account created on Mr. P. Pereira's computer, using a user name that did not identify him or the Company and did not purport to be made by or on behalf of him or the Company. Certain of these posts touted the Company and its prospects, some of which posts the Investigation found included inaccurate statements regarding the Company. The social media posts were made from this account without the Board's knowledge or approval. Mr. P. Pereira denied making the social media posts.

101.    The false and misleading statements above exposed the Company to the potential

of liability in the Securities Action and in ongoing or future regulatory investigations or

enforcement actions. As the Company itself noted in the February 23, 2022 Form 8-K:

*Potential consequences of the Investigation and the other matters discussed in this Current Report on Form 8-K include, but are not limited to: the possibility that the Nasdaq may delist the Company's securities; the possibility that the SEC may bring an enforcement action against the Company; the possibility that the U.S. Department of Justice or other governmental authorities or regulators may commence, or have commenced, investigations into the facts underlying the Investigation; the consequences of any such investigations or actions, including the imposition of civil or criminal penalties; the risk that the Company may become subject to additional stockholder lawsuits*; the impact on the Company's previously issued financial statements; and the effect of the Investigation and such other matters on the Company's conclusions regarding the effectiveness of internal control over financial reporting and disclosure controls and procedures and the Company's ability to become current in its filings with the SEC.

(Emphasis added).

102.   The Investigation further found that:

Mr. C. Pereira (a) took control of, and prevented the Company from administering, its Google Workspace (which includes the Company's email accounts, calendars, contacts, chats and saved files) and its Amazon Web Services (which hosts tablet data and provides a platform for the Company's software development), and (b) obtained from Google downloadable access to all data maintained in the Company's Google Workspace; and (ii) Messrs. P. Pereira and McIntosh accessed and downloaded files from the Company's Google Drive. The Company was able to continue its business because it was able to implement "workarounds" with respect to the Google Workspace and Amazon Web Service lockouts described above. Mr. C. Pereira's interference with the Google Workspace hindered and delayed, and increased the expense to the Company of, the Investigation.

103.   The Investigation also found that the Company had deficient internal control over financial reporting, stating as follows:

The Investigation found the Company's internal control over financial reporting to be deficient with respect to: (i) the disbursement process for third-party vendors; the review and approval process for significant vendor contracts; (iii) the use of Company credit cards by executives; (iv) the supervision and approval of travel and entertainment expenses incurred by executives; (v) the segregation of duties in connection with the payment and recording of invoices and related bank reconciliations; (vi) the lack of a sufficient accounting manual; and (vii) guidelines for the capitalization of fixed assets.

104.   The findings of the Investigation set forth certain recommendations to enhance the Company's internal control over financial reporting, including enhanced controls for disbursements of funds for vendor invoices, segregating duties across financial operations, developing a comprehensive accounting manual, maintaining a newly established travel and entertainment policy, establishing a review and approval process for significant vendor contracts; and retaining a consulting firm specializing in internal control implementation and design.

105.   On March 11, 2021, the Company filed a current report on Form 8-K with the SEC. The Form 8-K stated that the Company's previously issued audited financial statements for the years ended December 31, 2019 and 2020, included in the Company's Registration Statement, and the Company's previously issued interim financial statements included in the 1Q21 10-Q and 2Q21

10-Q should no longer be relied upon as a result of certain accounting errors. Specifically, the Company identified the following accounting errors, which in part related to certain bridge loans executed between the Company and certain Individual Defendants:

> The Company incorrectly capitalized certain general and administrative expenses incurred during the years ended December 31, 2018, 2019, and 2020, and incorrectly included those costs in intangible assets in its balance sheets as of December 31, 2019 and 2020, March 31, 2021, and June 30, 2021.

> The Company overstated the carrying value of tablets by incorrectly reporting them at cost with no allowance for depreciation, resulting in an overstatement of other assets (complimentary devices), net, in its balance sheets as of December 31, 2019 and 2020, March 31, 2021, and June 30, 2021.

> The Company overstated total assets and total liabilities as of December 31, 2020, by incorrectly recording a note receivable (related parties) and a liability included in current portion of long-term debt (related parties). This note receivable represents a bridge loan provided to the Company by certain related parties that was executed in December 2020 but not fully funded until April 2021.

> The Company did not recognize and report on its balance sheets as of December 31, 2019 and 2020, March 31, 2021, and June 30, 2021, an office lease in accordance with Financial Accounting Standards Board Accounting Standards Update No. 2018-11, Leases (Topic 842).

106.   The March 11, 2021 Form 8-K also noted that the Company suffered from a liquidity problem, noting that it "currently has very limited cash on hand," and that it was planning to sell the Condominium. The March 11, 2021 Form 8-K stated as follows:

> Since its inception, the Company has generated only nominal revenue from customers and business activity and currently has very limited cash on hand. *As a result, the Company intends to raise additional capital through the sale of the Company's condominium located in Miami Beach, Florida,* and through equity and debt financings. The Company and its management provide no assurance that such sale or financing transactions will be completed on terms favorable to the Company, or at all, or that, if completed, the proceeds therefrom will be sufficient to enable the Company to continue its development activities or sustain operations. The terms of any financing transactions that may be undertaken by the Company may adversely affect the holdings or the rights of the Company's stockholders.

> If the Company is unable to raise sufficient additional capital, then it will be required to more aggressively manage its cash flow by extending payables,

reducing overhead and scaling back its current business plan until sufficient additional capital is raised to support continued operations. There is no assurance that such efforts will be successful. Furthermore, if the Company is unable to raise sufficient additional capital, then the Company will be required to pursue other alternatives which may include selling assets, selling or merging its business, ceasing operations or filing a petition for bankruptcy (either liquidation or reorganization) under applicable bankruptcy laws.

(Emphasis added).

107.     On April 1, 2022, Alfi filed a Form NT 10-K (the "Form NT 10-K") giving notice of the Company's inability to timely file its Form 10-K for the period ended December 31, 2021. The Form NT 10-K explained that the Company's review of prior period financial statements, including the determination of all required adjustments thereto, and the preparation of the restatements thereof, is ongoing. It further stated as follows concerning the Company's revenues, loss, and expenses for the year ended December 31, 2020:

The Company expects to report total revenues of approximately $25,000 for the year ended December 31, 2021, compared to total revenues of $0 for the year ended December 31, 2020. The Company expects to report a net loss of approximately $20 million for the year ended December 31, 2021, compared to a net loss of approximately $5 million for the year ended December 31, 2020. *The increase in net loss was largely due to increased general and administrative expenses driven in part by higher compensation and benefits expense and increased professional services expenses, including additional expenses incurred during the quarter ended December 31, 2021 related to the Company's previously disclosed independent internal investigation.* The foregoing figures are preliminary, unaudited, and subject to change in connection with the completion of the audit, and are prepared in accordance with U.S. generally accepted accounting principles.

(Emphasis added).

## *Repurchases*

108.     During the period in which the Company made false and misleading statements and/or omissions, the Individual Defendants caused the Company to initiate repurchases of its common stock at artificially inflated prices that substantially damaged the Company.

109.    The 2Q21 10-Q stated that Alfi announced a $2 million buyback of its common stock on June 23, 2021. The buyback was completed on July 9, 2021, with the Company acquiring 137,650 shares at an average price of $14.5296 per share.

110.    As the Company's stock was actually worth only $4.37 per share, the price at closing on November 16, 2021, the Company overpaid by approximately $1.4 million for repurchases of its own stock completed on July 9, 2021.

**Harm to the Company**

111.    As a direct and proximate result of the Individual Defendants' misconduct, Alfi has lost and will continue to lose and expend millions of dollars. Such losses include the costs of defending – and potentially paying class wide liability in – the Securities Action, the Company's overpayment by approximately $1.4 million for repurchases of its own stock, and the costs of the Investigation undertaken by the Special Committee, among other things.

112.    These losses also include: (i) the costs of acquiring the Condominium in Miami Beach for $1.1 million, reacquiring the Condominium after it was wrongfully transferred to an LLC, marketing the Condominium for sale, and any other associated costs; (ii) payments of cash and stock in connection with the commitment to sponsor the Tournament in the amount of $640,000, as well as the costs with canceling the sponsorship and recouping a portion of the payments; and (iii) payments made the three third-party vendors described herein and any costs associated with attempting to recoup those expenses.

113.    Additionally, these expenditures include, but are not limited to, unjust compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company, and loss of reputation and goodwill.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

114.    Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary duties by the Individual Defendants.

115.    Alfi is named solely as a nominal party in this action.  This is not a collusive action to confer jurisdiction on this Court that it would otherwise not have.

116.    Plaintiff is a current shareholder of Alfi and was a continuous shareholder of the Company during the period of the Individual Defendants' wrongdoing alleged herein. Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and retained counsel competent and experienced in derivative litigation.

117.    A pre-suit demand on the Board of Alfi is futile and, therefore, excused. During the illegal and wrongful course of conduct at the Company and to the present, the six-person Board consisted of Defendants Bordes, Ficken, Lee, and Smith (the "Director Defendants"), and Non-Parties Dolan and Daniel (together with the Director Defendants, the "Directors").  Accordingly, Plaintiff need only allege demand futility as to three of six Directors. As set forth below, all six, and if not all, at least the four Director Defendants, are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action, including because they face a substantial likelihood of liability, and so demand upon them to institute this action is not necessary because such a demand would have been a futile act.

118.    A pre-suit demand on the Board would be futile as there is reason to doubt that a majority of the members of the Board are capable of making an independent and/or disinterested decision to initiate and vigorously pursue this action. As set forth herein, Plaintiff has adequately alleged that there is reason to doubt that the six current directors of Alfi are capable of

disinterestedly and independently considering a demand to initiate and vigorously prosecute this action.

119.    The Director Defendants, together and individually, violated and breached their fiduciary duties of candor, good faith, and loyalty. Specifically, the Director Defendants knowingly approved and/or permitted the wrongs alleged herein and participated in efforts to conceal those wrongs. The Director Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

120.    The Director Defendants either knowingly or recklessly issued or caused the Company to issue the materially false and misleading statements alleged herein. The Director Defendants knew of the falsity of the misleading statements at the time they were made. As a result of the foregoing, the Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

121.    The Director Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation. As members of the Board charged with overseeing the Company's affairs, each of the Director Defendants had knowledge, or the fiduciary obligation to inform themselves, of information pertaining to the Company's core operations and the material events giving rise to these claims.

122.    Moreover, the Director Defendants willfully ignored, or recklessly failed to inform themselves of, the obvious problems with the Company's internal controls, practices, and

procedures, and failed to make a good faith effort to correct the problems or prevent their recurrence.

123.   Furthermore, while the price of the Company's securities was artificially inflated due to the false and misleading statements and omissions of material facts described herein, the Director Defendants caused the Company to overpay by approximately $1.4 million for 137,650 shares of its own common stock.

124.   Defendants Ficken and Smith are not disinterested or independent, and therefore, are incapable of considering demand because they serve as a member of the Audit Committee and, pursuant to the Audit Committee Charter, were specifically charged with the responsibility to assist the Board in fulfilling its oversight responsibilities related to, *inter alia*, regulatory, and public disclosure requirements.   Throughout the relevant time period, however, these Defendants breached their fiduciary duties to the Company by failing to prevent, correct, or inform the Board of, the issuance of material misstatements and omissions and the inadequacy of the Company's internal controls. Therefore, the Defendants Ficken and Smith cannot independently consider any demand to sue themselves for breaching his fiduciary duties to the Company, as that would expose them to substantial liability and threaten his livelihood.

125.   The Director Defendants, as members of the Board, were and are also subject to the Company's Code of Conduct. The Code of Conduct goes well beyond the basic fiduciary duties required by applicable laws, rules, and regulations, requiring the Director Defendants to also adhere to Alfi's standards of business conduct. The Director Defendants violated the Code of Conduct because they knowingly or recklessly engaged in and participated in making and/or causing the Company to make the materially false and misleading statements alleged herein.

Because the Director Defendants violated the Code of Conduct, they face a substantial likelihood of liability for breaching their fiduciary duties, and therefore demand upon them is futile.

126.    Each of the Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

127.    Each of the Director Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

128.    Additionally, each of the Director Defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company.

## COUNT I

**Against The Individual Defendants For Violations of § 10(b)
of the Exchange Act, 15 U.S.C. § 78(j), and Rule 10b-5, 17 C.F.R. §240.10b-5**

129.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

130.    The Individual Defendants violated § 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

131.    The Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved the materially false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to

disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

132.     The Individual Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they (i) employed devices, schemes and artifices to defraud; (ii) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (iii) engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of Alfi common stock.

133.     The Individual Defendants acted with scienter because they: (i) knew that the public documents and statements issued or disseminated in the name of Alfi were materially false and misleading; (ii) knew that such statements or documents would be issued or disseminated to the investing public; and (iii) knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws.

134.     The Individual Defendants, by virtue of their receipt of information reflecting the true facts of Alfi, their control over, and/or receipt and/or modification of Alfi's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning Alfi, participated in the fraudulent scheme alleged herein.

135.     As a result of the foregoing, the market price of Alfi common stock was artificially inflated during the relevant time period. In ignorance of the falsity of the statements, stockholders, including Plaintiff, relied on the statements described above and/or the integrity of the market price of Alfi common stock in purchasing Alfi common stock at prices that were artificially inflated as a result of these false and misleading statements and were damaged thereby.

136.     In addition, as a result of the wrongful conduct alleged herein, the Company has suffered significant damages, including the costs and expenses incurred in defending itself in the Securities Class Action and reputational harm. The Individual Defendants, through their violation of § 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, have exposed the Company to millions of dollars in potential class-wide damages in the Securities Action.

**COUNT II**

**Against The Individual Defendants**
**for Violations of Section 20(a) of the Exchange Act, 15 U.S.C. 78(t)**

137.     Plaintiff incorporates by reference and realleges each and every allegation set forth herein.

138.     The Individual Defendants, by virtue of their positions as directors and officers of Alfi and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of Alfi and each of its officers and directors who made the false and misleading statements alleged herein within the meaning of § 20(a) of the Exchange Act. The Individual Defendants had the power and influence and exercised the same to cause Alfi and each other to engage in the illegal conduct and practices complained of herein and violate § 10(b) of the Exchange Act.

**COUNT III**

**Against The Individual Defendants**
**For Breach Of Fiduciary Duty**

139.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

140.     The Individual Defendants owed the Company fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

38

141.    The Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

142.    The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by permitting the use of inadequate practices and procedures to guide the truthful dissemination of Company news to the investing public and to the Company's shareholders, allowing or permitting false and misleading statements to be disseminated in the Company's SEC filings and other disclosures and, otherwise failing to ensure that adequate internal controls were in place regarding the serious business reporting issues and deficiencies described above. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

143.    As a direct and proximate result of the Individual Defendants' failure to fulfill their fiduciary obligations, the Company has sustained significant damages.

144.    As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company. As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs incurred in defending itself in the Securities Class Action, exposing the Company to millions of dollars in potential class-wide damages in the Securities Class Action, and damage to the share price of the Company's stock, resulting in an increased cost of capital, and reputational harm.

## COUNT IV

### Against The Individual Defendants For Aiding and Abetting Breach of Fiduciary Duty

145.    Plaintiff incorporates by reference and realleges each and every allegation

contained above, as though fully set forth herein.

146.    By encouraging and accomplishing the illegal and improper transactions alleged herein and concealing them from the public, the Individual Defendants have each encouraged, facilitated, and advanced their breaches of their fiduciary duties. In so doing, the Individual Defendants have each aided and abetted, conspired, and schemed with one another to breach their fiduciary duties, waste the Company's corporate assets, and engage in the ultra vires and illegal conduct complained of herein.

147.    Plaintiff on behalf of Alfi has no adequate remedy at law.

<u>**COUNT V**</u>

**Against The Individual Defendants For Unjust Enrichment**

148.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

149.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Alfi.

150.    The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Alfi that was tied to the performance or artificially inflated valuation of Alfi, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

151.    Plaintiff, as a shareholder and a representative of Alfi, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits and other compensation procured by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

152.    Plaintiff on behalf of Alfi has no adequate remedy at law.

**COUNT VI**

**Against The Individual Defendants
For Waste Of Corporate Assets**

153.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

154.    The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the time period in issue. It resulted in continuous, connected, and ongoing harm to the Company.

155.    As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, *inter alia*: (a) paying and colleting excessive compensation and bonuses; and (b) incurring potentially millions of dollars of legal liability and/or legal costs, including defending the Company and its officers against the Securities Action.

156.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

157.    Plaintiff on behalf Alfi has no adequate remedy at law.

**COUNT VII**

**Against The Individual Defendants
For Abuse of Control**

158.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

159.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Alfi, for which they are legally responsible.

160.    This misconduct includes, but is not limited to, Defendant P. Pereira's, McIntosh's, and C. Pereira's making of false and misleading statements, use Company resources without

41

authorization, and interference with the Investigation.

161.    As a direct and proximate result of the Individual Defendants' abuse of control, Alfi has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

162.    Plaintiff on behalf Alfi has no adequate remedy at law.

## COUNT VIII

### Against The Individual Defendants
### For Gross Mismanagement

163.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

164.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Alfi in a manner consistent with the operations of a publicly-held corporation.

165.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Alfi has sustained and will continue to sustain significant damages.

166.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

167.    Plaintiff on behalf Alfi has no adequate remedy at law.

## COUNT IX

### Against Defendants P. Pereira, McIntosh, Bordes,
### Cook, Elkouri, Ficken, Lee, Mowser, and Smith For Contribution
### Under Section 11(f) of the Securities Act, 15 U.S.C. § 77k(f)

168.    Plaintiff incorporates by reference and realleges each and every allegation

contained above, as though fully set forth herein.

169.    As a result of the conduct alleged herein, the Company is a defendant in the Securities Action, in which it is a joint tortfeasor in claims brought under Sections 11 and 15 of the Securities Act.

170.    Federal law provides Alfi with a cause of action against other alleged joint tortfeasors under Section 11(f) of the Securities Act.

171.    The plaintiffs in the Securities Action allege that the Offering Documents were inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

172.    Defendants P. Pereira, McIntosh, Bordes, Cook, Elkouri, Ficken, Lee, Mowser, and Smith were responsible for the contents and dissemination of the Offering Documents.

173.    Alfi is the registrant for the IPO. As issuer of the shares, Alfi is strictly liable to the class action plaintiffs and the class for the misstatements and omissions.

174.    The plaintiffs in the Securities Action allege that none of the defendants named therein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Offering Documents were true and without omissions of any material facts and were not misleading.

175.    Defendants P. Pereira, McIntosh, Bordes, Cook, Elkouri, Ficken, Lee, Mowser, and Smith, because of their positions of control and authority as controlling shareholder, officers, and directors of Alfi, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Alfi, including the wrongful acts complained of herein and in the Securities Class Action.

176.    Alfi is entitled to receive all appropriate contribution or indemnification from Defendants P. Pereira, McIntosh, Bordes, Cook, Elkouri, Ficken, Lee, Mowser, and Smith.

177.    Plaintiff on behalf Alfi has no adequate remedy at law.

### COUNT X

**Against Defendants P. Pereira and McIntosh For Contribution
Under Section 21D(f)(5) of the Exchange, 15 U.S.C. § 78u-4(f)(5)**

178.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

179.    The Company and Defendants P. Pereira and Defendant McIntosh are named as defendants in the Securities Action, which assert claims under the federal securities laws for violations of Sections 10(b) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder, as well as 20(a) of the Exchange Act. If and when the Company is found liable in the Securities Action, the Company's liability will be in whole or in part due to Defendants P. Pereira's and McIntosh's willful and/or reckless violations of their obligations as officers and/or directors of Alfi.

180.    Because of their positions of control and authority as CEO and CFO of Alfi, Defendants P. Pereira and McIntosh, respectively, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Alfi, including the wrongful acts complained of herein and in the Securities Action.

181.    Federal law provides Alfi with a cause of action against other alleged joint tortfeasors under Section 21D(f)(5) of the Exchange Act.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.      Awarding money damages against all Individual Defendants, jointly and severally, for all losses and damages suffered as a result of the acts and transactions complained of herein, together with pre-judgment interest, molded in a fashion to ensure the Individual Defendants do not participate therein or benefit thereby;

B.      Directing all Individual Defendants to account for all damages caused by them and all profits and special benefits and unjust enrichment they have obtained as a result of their unlawful conduct, including all salaries, bonuses, fees, stock awards, options and common stock sale proceeds, and imposing a constructive trust thereon;

C.      Awarding punitive damages;

D.      Awarding costs and disbursements of this action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.      Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated: July 28, 2022

**CULLIN O'BRIEN LAW, P.A.**

By:  *s/Cullin O'Brien*

**OF COUSEL:**

**RIGRODSKY LAW, P.A.**
Seth D. Rigrodsky
Timothy J. MacFall
Gina M. Serra
Vincent A. Licata
825 East Gate Boulevard, Suite 300
Garden City, NY 11530
Telephone: (516) 683-3516
sdr@rl-legal.com
tjm@rl-legal.com
gms@rl-legal.com
vl@rl-legal.com

Cullin O'Brien (FL# 0597341)
6541 NE 21st Way
Fort Lauderdale, FL 33308
Telephone: (561) 676-6370
Facsimile: (561) 320-0285
cullin@cullinobrienlaw.com

*Attorneys for Plaintiff*